**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:08cr461 (LMB)** |
| | ) | |
| **MICHAEL MITRY HADEED, JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, NEW TRIAL

Defendant Michael Mitry Hadeed, Jr. moves, pursuant to Fed. R. Crim. P. 29(c), for a

Judgment of Acquittal or, in the alternative, for a new trial, pursuant to Fed. R. Crim. P. 33.

## INTRODUCTION

The Government charged Mr. Hadeed with 62 overt acts in furtherance of an immigration

fraud conspiracy that was alleged to stretch back to 1999.  Only 12 of these 62 overt acts were

alleged to have occurred within the five-year statute of limitations.  Of the 12 acts that were

within the statute of limitations, the Government failed completely to support the two central

overt acts asserted in connection with the substantive immigration fraud counts – *i.e.*, possession

of an Employment Authorization Document that was procured by fraud or otherwise unlawfully

obtained.  Based on this failure of proof, the Court granted Mr. Hadeed's Rule 29 Motion with

respect to those two substantive counts at the close of the Government's case-in-chief.

That left just 10 of the 62 overt acts remaining for consideration by the jury.  Of those

remaining overt acts, 7 related to the dismissed substantive immigration fraud counts concerning

Mr. Alakwa (who did not even appear at trial) and Ms. Pagoaga.  As a result, just 3 overt acts, all

of which related to Mr. Freifer, remained for serious consideration by the jury.  On February 13,

2009, after a week-long trial, Mr. Hadeed was convicted of conspiracy, in violation of 18 U.S.C. § 371 (Count One), and of aiding and abetting a false statement with regard to Mr. Freifer's application, in violation of 18 U.S.C. § 1001 (Count Two).

From the beginning, the Government recognized that it had a very weak case against Mr. Hadeed. The Government did not execute any search warrants of Mr. Hadeed's office or otherwise seek to obtain any of his files, instead relying on testimony to carry the day. As the Court noted, the Government "could have and should have the documents," but "chose to prosecute the case . . . with testimony rather than documents." Feb. 10, 2009 Trial Tr. at 12, ll. 20-21 & 15 ll. 14-15 (attached as Exhibit A).

To compensate for its lack of documentary evidence, the Government based more than 80% of its case on overt acts that occurred well outside the statute of limitations. By charging Mr. Hadeed with two counts of immigration fraud under a theory for which the Government *never* had *any proof* relating to the central element of the offense charged (possession of Employment Authorization Documents obtained by fraud), the Government was also able to include within the case additional allegations that the Government had to have known were not supported by the evidence.

The Government then attempted to introduce a large amount of collateral Rule 404(b) evidence concerning additional immigration petitions that were not related to the King of Pita Bakery. The Court properly rejected this attempt. The Court did, however, allow the testimony of the bookkeeper of Mr. Hadeed's former firm, Vikki Ravinskas. Ms. Ravinskas testified to, among other things, certain alleged "admissions" by Mr. Hadeed, one of which related to the arrest of Mr. Hadeed's paralegal, Ana Araos, in connection with the Government's investigation

of Pillar Construction.  (These charges against Ms. Araos later were dropped for lack of evidence.)

The Government's strategy was to compensate for the lack of quality of its evidence with a huge quantity of weak and time-barred accusations, in the hope that the sheer volume of the allegations would convince the jury that the Government had a quality case.  Even though Mr. Hadeed was able to whittle this case down to just a handful of overt acts before the case went to the jury, the Government's unfair gambit ultimately proved successful.

These tactics created the very real possibility that the jury convicted an innocent man.  While Mr. Freifer had a certain charisma as a witness, his story was extremely suspect.  First, he admitted that his relationship with Mr. Hadeed started with a lie (specifically, that Mr. Tahan told Mr. Hadeed that Messrs. Tahan and Freifer were relatives).  No one ever explained why a lie would have been necessary, given the Government's contention that Mr. Hadeed had been conspiring with Mr. Tahan since at least 1999.  Second, everything that Mr. Freifer said to or heard from Mr. Hadeed was translated by Mr. Tahan, who has to be among the least credible witnesses ever to testify in this Court.  Third, the scheme between Mr. Tahan and Mr. Freifer continued two years after Mr. Tahan was convicted and started cooperating with the Government, and, even more crucially, two years after Mr. Hadeed had dropped Mr. Freifer as a client.  Indeed, in 2006 and 2007, Mr. Freifer told the same story (that he was an experienced baker who had worked at the Al Najah Bakery in Beirut), with the same U.S. sponsor (Mr. Tahan and the King of Pita Bakery), but using *an entirely different attorney* (Orlando Gamarra, instead of Mr. Hadeed).  He admitted during trial that he continued to tell this story well into 2007, to a consular officer in Beirut.  Absent all of the collateral and time-barred allegations that the Government made the centerpiece of its case, there is no way that a jury would have found Mr.

Hadeed guilty given the doubt created by any one of these uncontroverted facts about Mr.

Freifer's case.

Mr. Hadeed now moves for a judgment of acquittal or, in the alternative, for a new trial

for the following reasons:

(1)   The testimony of Vikki Ravinskas impermissibly injected Rule 404(b) evidence concerning the Pillar Construction investigation into this case. This highly prejudicial and unfair testimony should not have been elicited and should not have been admitted without an appropriate limiting instruction.

(2)   The alleged conspiracy was irrational. There is no proof remotely suggesting that an experienced and competent practitioner such as Mr. Hadeed would have engaged in a such a senseless and irrational conspiracy.

(3)   The alleged false statements by all of the aliens were not material because each of the aliens named in the Indictment could have gotten green cards as unskilled workers in the same amount of time and for the same price.

(4)   There was a material and prejudicial variance between the single conspiracy charged in the Indictment and the evidence of multiple individual conspiracies offered at trial.

## I.    STANDARD

The standard for evaluating a motion for a judgment of acquittal is "whether there is

substantial evidence (direct or circumstantial) which, when taken in the light most favorable to

the prosecution would warrant a jury finding that the defendant was guilty beyond a reasonable

doubt." *United States v. McCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). In deciding such a

motion, the Court does not weigh the evidence or review the credibility of witnesses. *United

States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997). Similarly, the court does not examine the

evidence in a piecemeal fashion, but considers it in a cumulative context. *United States v.

Burgos*, 94 F.3d 849, 863 (4th Cir. 1996) (*en banc*).

**II.    THE VERDICT WAS IRREPARABLY TAINTED BY THE RAVINSKAS TESTIMONY CONCERNING THE ARREST OF ANA ARAOS IN CONNECTION WITH THE PILLAR INVESTIGATION**

The Government improperly elicited Rule 404(b) evidence when it questioned Vikki Ravinskas about Ana Araos's arrest in the Pillar Construction matter.  Because of the nature of this testimony, and the Government's confusing questioning, the jury likely mistakenly believed that Ms. Araos was arrested in connection with the King of Pita investigation.  As a result, Ms. Ravinskas's testimony infected the entire verdict and impermissibly strayed into evidence that the Court had excluded.

The Court held that it would not allow Rule 404(b) evidence into the case unless the defense opened the door to it, which it never did.  The Court's prohibition explicitly included evidence concerning the Pillar investigation.  Despite this ruling, the Government indicated that it still planned to call Ms. Ravinskas to testify in its case-in-chief.  Because of the free-wheeling nature of the information contained in Ms. Ravinskas's extensive interview memoranda, the defense requested that the Government provide a proffer as to what non-Rule 404(b) evidence Ms. Ravinskas would be able to offer.  The Government proffered that Ms. Ravinskas would testify only concerning various alleged "admissions."  Mr. Hadeed's reaction to Ms. Araos's arrest, however, constituted Rule 404(b) evidence because there can be no question that it was specific to Ms. Araos's arrest *in the Pillar matter*, and had nothing to do with King of Pita.

The Court excluded the Pillar evidence not only because it was collateral, but also because it is completely unfair to associate Mr. Hadeed with that conspiracy.  The Friday before trial, the defense read a portion of a transcript of a tape-recorded phone call involving the key player in the Pillar conspiracy, Max Najib.  During this telephone conversation, Mr. Najib was recorded making efforts to ensure that Mr. Hadeed knew nothing about the conspiracy.  As this

evidence showed, and as the defense pointed out during the discussion about the Government's anticipated Rule 404(b) evidence, straying into the Pillar matter would have required a much longer trial, as the parties would have been required to try the Pillar case alongside the King of Pita case.  In fact, the Government admitted during the grand jury session preceding the Indictment in this case that it did not have enough evidence against Mr. Hadeed to prosecute him in connection with the Pillar investigation.

After hearing the above, the Court preliminarily excluded the Rule 404(b) evidence (later formally excluding the evidence during trial), instructed the parties not to reference it during opening statements, and cautioned the defense not to open the door to this type of evidence. The defense took this warning to heart, and carefully crafted its opening statement, cross-examinations, and defense to focus on questioning the credibility of the Government's witnesses.

Despite the fact that the defense did not open the door to Pillar or any other collateral matter, the Government used the last witness in its case-in-chief to testify about a statement Mr. Hadeed made in connection with the Pillar prosecution.  Even though the Government repeatedly characterized this testimony as concerning an "admission," there is no question that the admission was not in relation to the King of Pita charges, or even to "immigration fraud" in the abstract.

The Government was well aware that Ms. Ravinskas's testimony was specific to the Pillar arrest.  In fact, the FBI memorandum detailing Ms. Ravinskas's recollection of this "admission" (relevant portion attached as Exhibit B) details that the statements she heard from Mr. Hadeed were specific reactions to the investigation of Pillar and the activities of Mr. Najib. The FBI memorandum states that Mr. Hadeed's full reaction to Ms. Araos's arrest was not limited to the "it should have been me" statements, but also included "I shouldn't have continued

the relationship with Max." In addition, as the memorandum states, Ms. Ravinskas did not hear this "admission" until two weeks after Ms. Araos's arrest, so Mr. Hadeed's statements were made after ample time had passed to learn that the charges related to Pillar. This is clear evidence that the "admission" made by Mr. Hadeed to Ms. Ravinskas was specific to the Pillar matter and Mr. Najib, and that it should have been excluded as Rule 404(b) evidence.

Even if Ms. Ravinskas's testimony concerned an admission, it can only be characterized as an admission to conduct that was well outside the Indictment, which necessarily makes it Rule 404(b) evidence.[1] Any admission of Rule 404(b) conduct must follow the rules governing Rule 404(b) evidence. *United States v. Gibson*, 170 F.3d 673, 677-80 (7th Cir. 1999) (analyzing prior incriminating statements concerning prior events under Rule 404(b)).

The Government failed to meet the requirements of Rule 404(b) concerning Ms. Ravinskas's testimony. She is not mentioned in the Government's Rule 404(b) notice. The Government also made no effort to show that the Rule 404(b) "admission" was relevant to any purpose other than to show Mr. Hadeed's propensity to commit immigration fraud, a purpose explicitly prohibited by Rule 404(b). In fact, the Government's questioning left the jury in the position of being free to believe that Mr. Hadeed's statements could have been related to the King of Pita charges or to "fraud" in general. Further, the Government's position – that Mr. Hadeed's reaction to the arrest of his paralegal for immigration fraud in a matter not related to the King of Pita is somehow not Rule 404(b) evidence – indicates that its purpose in offering this evidence was to suggest that Mr. Hadeed had a propensity to commit immigration fraud, which is specifically prohibited by Rule 404(b).

---

[1]    The fact that the Government characterized this statement as an admission does not remove it from Rule 404(b). For example, the Government would still have had to comply with Rule 404(b) if it had sought to present an admission made by Mr. Hadeed that he blatantly disregarded traffic laws by running a red light on the way to the office.

- 8 -

By improperly eliciting testimony concerning Rule 404(b) evidence, the Government placed the defense in an impossible position. The only defense to the confusing manner in which the Government elicited Ms. Ravinskas's testimony would have been to delve deep into the Pillar investigation on cross-examination. That Hobson's choice is equivalent to letting the Government open its own door for the introduction of evidence that the Court agreed was properly excluded under Rule 404(b). This type of "mini-trial" concerning the Pillar matter was precisely what the Court sought to avoid when it excluded the Rule 404(b) evidence in this trial. As the Court reminded the Government several times in this litigation, the 62 overt acts alleged in Count One of the Indictment should have been enough to prove its case. Straying into the Pillar matter during the testimony of its last witness, in a trial in which the defense carefully tailored its actions to avoid opening the door pursuant to the Court's instructions, is the height of unfairness.

Ms. Ravinskas's testimony concerning Mr. Hadeed's alleged reaction to Ms. Araos's arrest in the Pillar matter was improper Rule 404(b) evidence, confusing, and unfairly prejudicial. Perceived admissions are powerful evidence. As a result of the testimony of Ms. Ravinskas, we are faced with the likelihood that Mr. Hadeed was convicted based on propensity evidence, or an admission to conduct that was unrelated to the allegations in this case. Especially in light of the weak nature of the Government's evidence against Mr. Hadeed, there can be no doubt that Ms. Ravinskas's testimony unfairly infected the jury's verdict. *United States v. Hernandez*, 975 F.2d 1035, 1041-42 (4th Cir. 1992) (vacating conviction as a result of improperly admitted Rule 404(b) evidence). Mr. Hadeed is entitled to a judgment of acquittal, or in the alternative, a new trial.

- 9 -

### III.    THE ALLEGED CONSPIRACY WAS BASED ON AN IRRATIONAL THEORY

The Court should also grant Mr. Hadeed a judgment of acquittal because the alleged

conspiracy was irrational.  Uncontradicted evidence (in the form of the testimony of Defendant's

expert, Mark Mancini) showed that, at the time of the alleged conspiracy, there was no difference

in the time it took to get a skilled worker visa versus an unskilled worker visa.  Similarly, there

was no difference in the price that immigration attorneys charged their clients to process the

applications for such visas (and there is no evidence that Mr. Hadeed priced his services

differently for these types of applications).  Mr. Mancini also testified that, during the relevant

time period, the unemployment rate in Northern Virginia was extremely low, and it was very

difficult for local employers to fill even unskilled worker positions.  Thus, at all times relevant to

the issues in this case, it was just as fast and easy to get an unskilled worker visa as it was a

skilled worker visa.  The Government put on no evidence to the contrary.

The evidence also showed that Mr. Hadeed, during the relevant time period, was a skilled

lawyer with a large immigration practice who would have been aware of both the local

unemployment rate and the fact that, at that point in time, skilled and unskilled worker visas

were equally easy to obtain in terms of both price and speed.  There is nothing in the record

suggesting that Mr. Hadeed was either irrational or uninformed about these basic realities of

immigration law.

These completely unrebutted facts show that Mr. Hadeed had no economic motive or

other incentive to direct his clients to take the skilled worker visa route rather than pursuing

unskilled worker visas.  The Government failed to adduce at trial any reason why any reasonably

competent immigration attorney would advise clients in this geographic area, at that point in

time, to obtain false prior experience letters in support of applications for skilled worker visas

when it was just as easy – and infinitely less risky and time-consuming for all concerned – to obtain an unskilled worker visa.  If there was a conspiracy in this case, it has all the earmarks of having been run by someone with only a rudimentary knowledge of immigration law, such as Mr. Tahan, and not by a skilled practitioner, such as Mr. Hadeed.  The evidence at trial demonstrated that Mr. Tahan had a multitude of financial, sexual, and other motives to manipulate the immigration law process as he knew it.  Mr. Hadeed, however, had no such motives (as the evidence showed, Mr. Tahan owed him a sizeable debt for the work done over the years).  There is no rational basis upon which a jury could have concluded that Mr. Hadeed would have agreed to be part of a conspiracy that was unnecessary and made no business sense.

The allegations in this case are similar to those in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  *Matsushita* was an antitrust conspiracy case, brought under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2), that alleged a predatory pricing conspiracy among a group of Japanese electronics manufacturers.  The defendants argued that they were entitled to summary judgment because there was no evidence in the case demonstrating that they had a rational motive to engage in the alleged conspiracy.  In fact, as is the case here, the evidence showed that they had strong motives not to conspire in the manner alleged.  475 U.S. at 588.

The Supreme Court held that "the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists within the meaning of" Fed. R. Civ. P. 56(e) and that "[l]ack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence."  *Id.* at 596.  "[I]f petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."  *Id.* at 596-

97.  Because no evidence supported a rational conclusion that a conspiracy existed, summary judgment was appropriate.  *See also Zolfaghari v. Sheikholeslami*, 943 F.2d 451, 454 (4th Cir. 1991) (affirming grant of summary judgment in favor of defendant because plaintiff lacked evidence to show a plausible RICO Act claim); *United States ex rel. Crenshaw v. DeGayner*, No. 6:06-cv-1462-Orl-19KRS, 2008 U.S. Dist. LEXIS 86944 at *11 (M.D. Fla. Oct. 16, 2008) (summary judgment granted on implausible False Claims Act claim) ("why the Board would risk both criminal and civil liability for such a purpose is a looming question that [plaintiff] fails to answer") (copy attached as Exhibit C).[2]

A judgment of acquittal is at least as appropriate on these facts as was the grant of summary judgment in *Matsushita*.  The evidence in this case clearly showed that Mr. Hadeed had no rational economic or other motive to engage in the alleged misconduct.  In fact, if the conspiracy was as alleged by the Government, all the conspiracy did was increase the work required and risk involved, for no extra charge (as Mr. Hadeed charged a flat fee and did not bill by the hour).  The only rational inference on these facts is that Mr. Hadeed agreed to process the labor certifications based on skilled worker status because he legitimately believed that the clients involved had experience as bakers.

The evidence against Mr. Hadeed is even more ambiguous than the evidence in *Matsushita*.  Mr. Hadeed was convicted on a single substantive charge – aiding and abetting a false statement on Mr. Freifer's green card application.  The evidence at trial was that Mr. Tahan introduced Mr. Freifer to Mr. Hadeed.  That relationship began in a lie.  Mr. Freifer testified that Mr. Tahan falsely told Mr. Hadeed that Messrs. Tahan and Freifer were relatives.  The

---

[2]     Counsel for Mr. Hadeed recognizes that *Matsushita* is a civil case.  However, the Sherman Act is both a criminal and civil statute.  There is no reason why the question of whether the facts show an irrational conspiracy should only apply to civil cases.  Indeed, given that the burden of proof is higher in a criminal case, the burden on the Government to put on evidence of plausibility should be even higher.

Government offered no explanation as to why, in the case of Mr. Freifer – the very last spoke in the alleged conspiracy – such a lie would have been necessary to induce Mr. Hadeed to act. According to the Government's theory, Messrs. Hadeed and Tahan already had been conspiring for many years at that point.

As Mr. Freifer testified, the entire conversation among Mr. Freifer, Mr. Tahan, and Mr. Hadeed was translated by and filtered through Mr. Tahan. Mr. Tahan was an extremely weak witness and a demonstrated pathological liar whom the Government stipulated was a "sleaze" in its closing argument.

The most ambiguous evidence, however, about the entire Freifer application is the fact that two years after pleading guilty to immigration fraud, and after having been extensively de-briefed by the Government at least twenty times, Mr. Tahan was still working with Mr. Freifer to get Mr. Freifer a green card based on his prior experience as a baker – only this time using the services of a different attorney, Orlando Gamarra. Def. Exhs. 77 and 99 (Form DS-230 signed by Freifer on Oct. 10, 2006; Sept. 2006 letter from Tahan regarding existing employment offer for Freifer). Thus, it was the same sponsor (Tahan/King of Pita) and the same story about having worked at the Al Najah Bakery, but a different attorney. This evidence strongly indicates that Mr. Hadeed was nothing more than one in a series of unwitting foils used by Tahan in his ill-considered immigration fraud schemes. That inference is even stronger when one considers the irrational nature of the alleged conspiracy. Absent evidence suggesting why Mr. Hadeed would engage in a conspiracy that was unnecessary from both a regulatory standpoint and a financial standpoint, a judgment of acquittal is appropriate.

## IV.    THE ALLEGEDLY FALSE STATEMENT WAS NOT MATERIAL AS A MATTER OF LAW

Mr. Hadeed is also entitled to a judgment of acquittal because the allegedly false statement was not material as a matter of law.  In this case, a statement would be material if, and only if, the truth about the aliens' work experience was (i) known by the immigration authorities and (ii) would have prevented the aliens from receiving green cards.  The statements concerning each alien's experience as a baker were all immaterial because it is undisputed that each of the aliens named in the Indictment would have gotten green cards – just as fast and for the same price – regardless of whether they had experience as bakers, had they applied as unskilled workers.  The evidence in this case is undisputed on this point.

In *Chaunt v. United States*, 364 U.S. 350, 355 (1960), the Supreme Court held that to de-naturalize a citizen on the basis of a material misrepresentation or concealment of facts, the Government must prove that if the truth were disclosed, it would have warranted denial of the petition.  Said another way, if the truth would not have changed the result, then the alleged misrepresentation was incapable of influencing agency action and, thus, the misrepresentation was immaterial.[3]

---

[3]    The Supreme Court revisited *Chaunt* in *Kungys v. United States*, 485 U.S. 759 (1988).  This resulted in a fractured opinion that now forms the modern day definition of materiality, *i.e.*, a statement is material if it has "a natural tendency to influence the decisions of the Immigration and Naturalization Service." *Id.* at 772.  One of the propositions *Kungys* firmly established, however, is that the issue of materiality is a question of law, which makes this issue appropriate for determination on a Rule 29 motion. *Id.* at 772.  *Kungys* also established that the materiality test is the same in the criminal context as it is in the denaturalization context. *Id.* at 771 ("Surely . . . there is no less need for precision in the criminal context than there is in the denaturalization context").  *Kungys* did not overrule or change the outcome in *Chaunt* in any respect.  Rather, it sought to provide a definition of materiality that could be applied over a wider variety of cases.  "[T]hus, while the Chaunt formulation may be an adequate explanation of why the misrepresentation in that case was judged not to have a natural tendency to influence the decision, it does not necessarily facilitate judgment in the infinite variety of other factual patterns that may emerge." *Id.* at 771.  Accordingly, the teachings of *Chaunt* and its many progeny remain instructive.  Nothing in *Kungys* relieves the Government of its burden of establishing that the aliens in this case would not have been entitled to green cards had they applied as unskilled workers.

This rule, both before and after *Chaunt*, has been widely held to encompass visa applications. *See, e.g.*, *United States v. Rossi*, 299 F.2d 650, 652-53 (9th Cir. 1962) (holding that a fact suppressed or misstated is not material to an alien's entry unless the truth would have justified a refusal to issue the visa); *La Madrid-Peraza v. INS*, 492 F.2d 1297 (9th Cir. 1974) (reversing deportation order even though alien made a misrepresentation to obtain her visa by overstating her wages to obtain a labor certification; the misrepresentation was deemed not material due to Government's failure to produce local prevailing wage information); *accord United States ex rel. Fink v. Reimer*, 96 F.2d 217, 218 (2d Cir. 1938) ("a fact suppressed or misstated is not material to the alien's entry, unless it is one which, if known, would have justified [exclusion]") (L. Hand, J.); *Monter v. Gonzales*, 430 F.3d 546, 556 n.12 (2d Cir. 2005) (surveying the case law on this issue and observing that all the circuit courts that had considered the issue applied the *Chaunt* test to visa applications).

There are some striking analogies between the facts in Mr. Hadeed's case and those in *Rossi*. Mr. Rossi, a native of Italy, entered the United States in 1926 or 1927, but then voluntarily departed to a town on the border between Peru and Chile called Tacna. While Rossi was in Tacna, there was a dispute over the sovereignty of Tacna that was submitted to a vote of the citizenry. Rossi assumed the identity of his dead brother, a former resident of Tacna, to vote in the local plebiscite.

Rossi later returned to Italy on his brother's Chilean passport. Knowing that United States immigration law imposed no quotas on South Americans, and that there was (at the time) a quota on Italian immigrants, Rossi used the name and nationality of his dead brother when applying for a visa. He was issued a non-quota visa, entered the United States, and later became a citizen. *Rossi*, 299 F.2d at 651. The Ninth Circuit held that Rossi's assumption of his brother's

identity was not a material misrepresentation because the Government had failed to put on any evidence showing that Rossi would have been ineligible for a quota visa, or that he was an undesirable alien subject to exclusion. *Id.* at 653. *Compare Reimer*, 96 F.2d 217 (Fink had impersonated a man named Apfelroth; court held misrepresentation was material because Apfelroth could get a visa and Fink could not) *with United States ex rel. Leibowitz v. Schlotfeldt*, 94 F.2d 263 (7th Cir. 1938) (immigrant used brother's name to escape compulsory foreign military service and continued to use brother's name when he immigrated to the United States; court held that misrepresentation was immaterial because immigrant could have secured a visa in his own name as readily as he did in the guise of his brother).

    In Mr. Freifer's case, which is the only substantive charge on which Mr. Hadeed was found guilty, the alleged misrepresentation concerned not the identity or nationality of the visa applicant, but whether Mr. Freifer had experience as a baker sufficient to qualify for a skilled worker labor certification. That misrepresentation, however, is demonstrably as irrelevant to the question of whether Mr. Freifer was entitled to a green card as was the actual identity of the applicants in *Schlotfeldt* and *Rossi*. The completely uncontroverted evidence in this case was that there was *no difference* in terms of timing, price, or availability between skilled and unskilled worker visa applications during the relevant time period. The Government put on no evidence that Mr. Freifer would not have been entitled to a green card as an unskilled worker. Mr. Freifer had a bona fide job offer to work at King of Pita and he applied for his visa at time and in a region in which there was virtually no unemployment. The evidence in the case shows that had Mr. Freifer applied for an unskilled worker visa, he would have gotten one just as quickly as he would have obtained a skilled worker visa.

Whether the statement in question was material ultimately depends on how narrowly the issue is framed.  If the issue is very narrowly framed as whether the statement was material to getting a skilled worker visa, then the allegedly false statement was likely material.  However, a long line of cases stretching back to the 1930s teaches that the courts have never framed the materiality inquiry in immigration cases so narrowly.  Rather, the courts have examined whether, if the truth were known, the applicant would have been entitled to a visa, green card or citizenship under *any* circumstance.[4]

Thus, the salient issue when it comes to materiality in this case is whether the alleged misrepresentation would have made a difference in getting a visa or green card (and if it would not have, it is very hard to argue that the Government was somehow defrauded).  The evidence on this point is unequivocal.  Due to the circumstances at the time of the applications, the alleged misrepresentations in this case would have made no difference.  At the time of their applications, each of the aliens named in this case, including Mr. Freifer, would have gotten a green card regardless of whether they had experience as a baker.  They had bona fide job offers and they were applying for jobs at a time when, and in a region where, the unemployment rate was effectively zero.  The allegedly false statement was therefore immaterial as a matter of law, and Mr. Hadeed is entitled to a judgment of acquittal.

---

[4]     Indeed, this appears to have been official State Department policy since at least 1955.  *See, e.g.*, *Cavillo v. Robinson*, 271 F.2d 249, 250 (7th Cir. 1959) ("a misstatement or concealment in an alien's application for a visa [is] not considered material if it appears that the applicant would have been equally entitled to what he obtained, or it appears that the applicant would not have been found ineligible to receive a visa, had he told the truth.  The word 'materiality' has been interpreted as referring to a fact or facts which would have justified the consul in refusing a visa had they been disclosed.") (quoting State Department Visa Office Bulletin (November 22, 1955)).

## V.    THE GOVERNMENT'S FAILURE TO PROVE THE SINGLE CONSPIRACY IT CHARGED CONSTITUTES A FATAL VARIANCE THAT MANDATES ACQUITTAL ON COUNT ONE

### A.    A Material Variance Occurred When the Government Charged a Single Conspiracy in the Indictment, but Proved Multiple Conspiracies at Trial

In Count One, the Government charged a single conspiracy among Mr. Hadeed and the following named co-conspirators: Tony Tahan, Marouf Arbid, Ibrahim Alakwa, Jean-Claude Sakr, Juana Pagoaga, and Charbel Freifer.  Although the Indictment identified the five alien conspirators only by name (not as co-conspirators), the Government explicitly confirmed that it considered them co-conspirators in its Responses to Mr. Hadeed's pre-trial Motions.  *See* Gov't. Resp. to Motion for Bill of Particulars, Doc. No. 53, at 2, 10 (Government stating that it "identified by name in the Indictment five separate alien co-conspirators," and specifically naming Jean-Claude Sakr as one of those five); *see also* Gov't. Resp. to Motion for Production of Witness List, Doc. No. 56, at 1 (Government stating that Indictment "identifies, by name[,] five co-conspirators who are alien beneficiaries of the fraud").

Having charged a single conspiracy in the Indictment, and having identified each of the aliens as co-conspirators thereto, the Government had to prove at trial that all of the co-conspirators shared "one overall agreement or one general business venture." *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988) (internal quotations omitted); *see also United States v. Warner*, 690 F.2d 545, 548-49 (6th Cir. 1982) ("In determining whether the evidence showed single or multiple conspiracies, we must bear in mind that the essence of the crime of conspiracy is agreement.").

The Government's theory at trial was that Mr. Hadeed and Mr. Tahan formed the hub of a conspiracy involving five alien co-conspirators, or "spokes," each of whom benefited from the alleged fraud.  To prevail on this theory, as a matter of law, the Government had to prove,

beyond a reasonable doubt, that each of these alien spokes did not merely enter into separate

agreements with the same hub, but that they each engaged in some concerted action in

furtherance that connected them, as a group, to the single conspiracy. *United States v. Kotteakos*,

328 U.S. 750, 755 (1946). In other words, the Government had to establish a "rim" connecting

the spokes by showing that each alien co-conspirator depended on, was aided by, or had an

interest in the success of the other co-conspirators. *United States v. Chandler,* 388 F.3d 796, 811

(11th Cir. 2004). Absent this showing, the conspiracy charged was a merely a "rimless wheel,"

which the Fourth Circuit has held amounts not to a single conspiracy, but instead to multiple,

separate conspiracies. *Dickson v. Microsoft Corp.,* 309 F.3d 193, 203 (4th Cir. 2002).

In a single conspiracy, all co-conspirators must be working toward the same common

goal. A "common aim" is "an indispensable ingredient of a conspiracy." *United States v. Goss,*

329 F.2d 180, 183 (4th Cir. 1964). For conduct by numerous persons to qualify as a single

conspiracy, it must be aimed at furthering a shared purpose, not the conspirators' own individual

purposes. There must be a "single, overall, comprehensive plan" among all of the conspirators

that is "directed to achieving a single unlawful end or result." *Blumenthal v. United States*, 332

U.S. 539, 558 (1947); *see also Goss*, 329 F.2d at 183 (reversing conspiracy convictions because

of variance and noting that "the single conspiracy of the indictment falls apart when the conduct

of the defendants is seen to consist of several instead of a sole combination").

No evidence in this case suggests, much less proves beyond a reasonable doubt, that the

alien co-conspirators acted to further any shared goal. In fact, the evidence showed that each of

the five alien co-conspirators separately engaged in immigration fraud for one simple and

individual reason – to achieve permanent residency status for himself or herself alone. No

alien's efforts to obtain permanent resident status, or success in obtaining permanent resident

status, depended on any other alien's efforts or success.  In fact, there is no evidence that any of
the aliens cared at all whether any another alien obtained a green card.

The evidence showed that the five aliens did not act in concert on even a single occasion.
They never helped each other complete or procure paperwork, or pay legal fees or fees to Tony
Tahan.  They did not recruit each other.  Even if the love triangle between Messrs. Tahan, Sakr
and Arbid showed some indicia of a common plan or goal, all of that conduct is time-barred, and
has nothing to do with the actions of the other alleged conspirators, namely:

**Juana Pagoaga**, who was a long-time employee of King of Pita who had let her
temporary protected status lapse.  She sought to take advantage, along with several other
Hispanic employees, of the short window of opportunity afforded by the LIFE Act to get a green
card.  There is no evidence that she was connected in any way, other than through her
employment at King of Pita, with Messrs. Arbid, Sakr, Alakwa, or Freifer.  There is no evidence
that she was concerned in the least with whether they received green cards.

**Ibrahim Alakwa**, who has no alleged connection with any of the other alien
conspirators.  No one has seen him in five years.  The only person other than Mr. Tahan who
claims even to have met Mr. Alakwa was Mohamed Korayem, and he is not one of the alleged
conspirators.  There was no connection proved, or even alleged, between Mr. Alakwa and any
other conspirator.  The no-show employee and paycheck repayment scheme alleged by Mr.
Tahan is completely unlike the conduct associated with any other alien.

**Charbel Freifer**, discussed above, whose case is also *sui generis*.  He was not one of Mr.
Tahan's love interests.  He never worked at King of Pita illegally.  He was in Lebanon during
almost all of the time the alleged conspiracy was occurring.  Moreover, he was still scheming
with Mr. Tahan to get an employment-based visa two years after Mr. Hadeed dropped him as a

client, which also was two years after Tahan, Arbid, and Sakr had all either pleaded guilty to, or been convicted of, immigration fraud.

At best, the evidence in this case could only be construed as showing a series of five individual agreements, each including Mr. Tahan and one alien, and each with its own distinct end: obtaining permanent residency *for that particular alien.  See Blumenthal*, 332 U.S. at 558 (discussing *Kotteakos* and noting that, in that case, "each separate agreement had its own distinct, illegal end").  The fact that the aliens were all breaking the same law *does not transform their individual goals into a shared one.  Goss,* 329 F.2d at 183 (reversing defendants' convictions for conspiracy where "the only thing in common was the law they were breaking"); *see also Rocha v. United States*, 288 F.2d 545, 553 (9th Cir. 1961) (reversing convictions for conspiracy to commit immigration fraud where Government "confuse[d] the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character") (internal quotations and citations omitted).

Shoehorning these five agreements into a single conspiracy results in the bizarre and wholly unsupported conclusion that each alien conspired with Messrs. Tahan and Hadeed to further other aliens' efforts to obtain permanent resident status.  For example, the agreement between Mr. Tahan, Mr. Hadeed, and Mr. Freifer would have to include, as one of its objects, the procurement of a green card for Ms. Pagoaga.  This is more than contrary to common sense; there was not a shred of evidence of such a common plan or shared goal in this case.

To prove a single conspiracy, the Government had to demonstrate that there was interdependence among the co-conspirators aimed at achieving one common goal.  The Government did not prove any such interdependence at trial.  No reasonable juror could have found a single conspiracy.

**B.    The Variance Resulted in Actual and Substantial Prejudice to Mr. Hadeed**

When there is a variance between the charge in the Indictment and the facts proven at trial, reversal is required if the defendant shows that the variance resulted in actual prejudice to him.  *United States v. Kennedy,* 32 F.3d 876, 883 (4th Cir. 1994).  A variance is fatal if it caused the defendant "actual prejudice," meaning prejudice that results in an outcome at trial that is "unreliable or fundamentally unfair."  *United States v. Leon,* 33 Fed. Appx. 690, 691 (4th Cir. 2002) (copy attached as Exhibit D).  The variance between the Government's charges in the Indictment and its proof at trial resulted in two substantial prejudices to Mr. Hadeed.

First, as a result of alleging a single conspiracy, the Government was able to present time-barred claims that never should have reached a jury because they fell outside of the statute of limitations in this case.  Second, to the extent that any portion of this evidence was eligible for admission under Fed. R. Evid. 404(b), as evidence of other "bad acts" subject to a limiting instruction, the Government failed to meet the basic admissibility requirements for Rule 404(b) evidence.  The end result is that the Government severely prejudiced Mr. Hadeed by offering time-barred conduct for propensity purposes, which created an impermissible evidentiary advantage at trial that contaminated the entire jury verdict in this case.

Employing a "quantity-equals-quality" strategy, the Government used the single conspiracy charge to fold in claims relating to separate conspiracies and conduct dating back as far as 1999.  The Government's incentive for including multiple time-barred claims in a single, overarching conspiracy is plain.  Had the Government pled the multiple conspiracies that its evidence supported, it could not have included any conduct occurring before November 18, 2003, because of the five-year statute of limitations.  Statutes of limitations exist to "provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a

defendant's right to a fair trial would be prejudiced." *United States v. Marion*, 404 U.S. 307, 322 (1971); *see also Burnett v. New York Cent. R.R.. Co.*, 380 U.S. 424, 428 (1965) (statutes of limitations exist "to assure fairness to defendants"). The Government circumvented this limit by pleading a single conspiracy when its evidence only supported a much smaller universe of multiple, separate conspiracies. This resulted in unfair prejudice to Mr. Hadeed.

This is not a case where the Government was able to slip in a few outdated acts by charging a single conspiracy. Rather, more than 80% of the overt acts charged, and the evidence presented to prove them, related to time-barred conduct that likely could not have come in had the Government charged multiple conspiracies. And if it had come in, it would have been admitted pursuant to Rule 404(b), with appropriate limiting instructions. Yet the Government was able to avoid the restrictions of Rule 404(b) altogether by pleading a single conspiracy that its evidence did not support. In so circumventing the Federal Rules of Evidence, the Government created the impermissible likelihood that the jury relied on improper evidence for propensity purposes, in contravention of the very purpose of the rules of evidence to ensure the reliability and quality of evidence presented to the jury.

The Government's ultimately successful, but completely unfair, strategy was to inundate the jury with multiple offerings of exceedingly weak testimony in the hope that the sheer volume of questionable evidence would make up for its utter lack of quality and reliability. The only way for the Government to carry out this plan was to lump all of the allegations against Mr. Hadeed into a single conspiracy that it could not prove. *See United States v. McLean*, No. 96-cr-4789, 1998 U.S. App. LEXIS 31500 at *18-19 (4th Cir. Dec. 17, 1998) ("Conspiracy charges are useful tools for prosecutors, but using the charge to reach well beyond the range of activity supported by the evidence is an abuse of the weapon") (copy attached at Exhibit E). This unfair

tactic not only deprived Mr. Hadeed of the protection afforded by statutes of limitations and the Federal Rules of Evidence, but it infected the entire trial, including the verdict on Count Two.

### C.     The Variance Requires Reversal or, in the Alternative, a New Trial

As explained above, the material variance between the single conspiracy alleged in the Indictment and the multiple conspiracies supported by the proof at trial vitiated the substantial rights afforded Mr. Hadeed by the statute of limitations and by the rules of evidence.  The Government's failure to prove the single conspiracy alleged in Count One, and the taint caused by this unfair and improper tactic, invalidate the conviction on that count as a matter of law.

If the Court declines to find, as a matter of law, that the proof at trial varied fatally from the charge in the Indictment, and that such variance prejudiced Mr. Hadeed, then, in the alternative, Mr. Hadeed is entitled to a new trial.  At a minimum, Mr.  Hadeed was entitled to have the jury instructed about the legal effect of proving multiple conspiracies when a single conspiracy has been charged.  At the close of evidence in this case, Mr. Hadeed submitted a supplemental jury instruction on multiple conspiracies.  The Court declined to include this instruction in its charge to the jury.

Any evidence of a common goal among the alleged co-conspirators in this case was extremely weak compared to the evidence of individual, separate goals.  It is entirely possible that the jury would have acquitted Mr. Hadeed of the conspiracy count if it had been instructed about the legal difference between single and multiple conspiracies.  Where the facts are sufficient to support the finding of multiple conspiracies instead of a single conspiracy, it is the proper function of the jury to decide what was proven.  *United States v. Banks*, 10 F.3d 1044, 1051 (4th Cir. 1993) ("the issue whether a single conspiracy charged or, instead, only multiple conspiracies not charged have been sufficiently established by the evidence is an issue for the

jury"); *see also United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988) ("The question whether the evidence shows a single conspiracy or multiple conspiracies . . . is one of fact and is properly the province of the jury"); *cf. United States v. Crockett*, 813 F.2d 1310, 1317 (4th Cir. 1987) ("If the facts support *only* a single conspiracy, the jury need not be instructed about multiple conspiracies") (emphasis added).  Indeed, the Government noted this point in its Response to Mr. Hadeed's pretrial Motion to Dismiss the Indictment.  *See* Gov't. Resp. to Motion to Dismiss, Doc. No. 60, at 14.

Should the Court decline to acquit Mr. Hadeed based on the material variance between the Indictment and the proof at trial, he is entitled to a new trial on the grounds that the Court should have given a multiple conspiracy instruction to the jury.

## **CONCLUSION**

For the reasons set forth above, Mr. Hadeed's motion for a judgment of acquittal under Fed. R. Crim. P. Rule 29(c) or, in the alternative, for a new trial in accordance with Fed. R. Crim. P. Rule 33, should be granted.

Respectfully submitted,

MICHAEL MITRY HADEED, JR.

By:    /s/_____
        Laurin H. Mills, Esq.
        *Pro Hac Vice*
        D. Grayson Yeargin, Esq.
        *Pro Hac Vice*
        Emily C. Harlan, Esq.
        VA Bar No. 76813
        Attorneys for MICHAEL MITRY HADEED, JR.
        NIXON PEABODY LLP
        401 Ninth Street, N.W., Suite 900
        Washington, D.C.  20004
        (202) 585-8000
        Fax (202) 585-8080

lmills@nixonpeabody.com
gyeargin@nixonpeabody.com
eharlan@nixonpeabody.com

William B. Cummings, Esq.
VA Bar No. 6469
Attorney for MICHAEL MITRY HADEED, JR.
WILLIAM B. CUMMINGS, P.C.
Post Office Box 1177
Alexandria, Virginia  22313
(703) 836-7997
Fax (703) 836-0238
wbcpclaw@aol.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of February, 2009, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of

such filing (NEF) to the following registered ECF users:

Anthony Asuncion, Esq.
United States Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530
anthony.asuncion@usdoj.gov

Scott B. Nussbum, Esq.
United States Attorney's Office for the Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia  22314
Scott.B.Nussbum@usdoj.gov

/s/_____
Laurin H. Mills, Esq.
*Pro Hac Vice*
D. Grayson Yeargin, Esq.
*Pro Hac Vice*
Emily C. Harlan, Esq.
VA Bar No. 76813
Attorneys for MICHAEL MITRY HADEED, JR.
NIXON PEABODY LLP
401 Ninth Street, N.W., Suite 900
Washington, D.C.  20004
(202) 585-8000
Fax (202) 585-8080
lmills@nixonpeabody.com
gyeargin@nixonpeabody.com
eharlan@nixonpeabody.com

William B. Cummings, Esq.
VA Bar No. 6469
Attorney for MICHAEL MITRY HADEED, JR.
WILLIAM B. CUMMINGS, P.C.
Post Office Box 1177
Alexandria, Virginia  22313
(703) 836-7997
Fax (703) 836-0238
wbcpclaw@aol.com